**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

Argued February 12, 2013
Decided May 3, 2013

Before

KENNETH F. RIPPLE, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

JAMES B. ZAGEL, *District Judge**


No. 12-2914

|  |  |
|---|---|
|  | Appeal from the |
| UNITED STATES OF AMERICA, | United States District Court |
| *Plaintiff-Appellee,* | for the Eastern District of Wisconsin. |
|  |  |
| *v.* | No. 12 CR 02 |
|  |  |
| GARY BLAIR, | Rudolph T. Randa, |
| *Defendant-Appellant.* | *Judge.* |

ORDER

   This is an appeal about an appeal. Gary Blair claims that he might have an appeal of a ten year sentence for armed robbery but he cannot make that argument because the judge who

---

* The Honorable James B. Zagel of the United States District Court for the Northern District of Illinois, sitting by designation.

imposed it did not clearly rule on two of the claimed grounds for mitigation. Absent these rulings Blair is unable to identify a judicial mistake as a ground for appeal. This procedural error, Blair says, can be rectified only by remanding the matter to the District Court to allow the sentencing judge to rule explicitly on the two objections, to give reasons for the rulings and to reveal how each of these objections should (or did) influence the sentence. After this the District Judge would again impose sentence. Blair would then have to decide whether to appeal the newly imposed sentence on it merits.[1]

## I. BACKGROUND

A. Blair's Criminal and Psychological History

Blair robbed a bank on December 6, 2011. He was arrested within minutes of the robbery and indicted on January 4, 2012. He entered into a plea agreement which was filed on March 1, 2012 and pled guilty on March 21, 2012. There is no reason to infer that guilt of this offense was ever in question.

The morning of December 6, 2011, Blair boarded and rode a bus 90 blocks from his house. He left the bus. Then he walked into a bank. He wore a sky-blue winter coat, wrapped a scarf around his face and wrote a demand note which he gave to a teller who complied. He ran out of the bank and stayed in the immediate area where police arrested him. He still had the money and told officers that he robbed the bank to get money to pay for the restitution he owed on three prior bank robbery convictions.

Blair's life has been troubled in many ways. He was first arrested at 15 and again at 16 and committed by a children's court to juvenile facilities. As an adult he was charged with a variety of defenses, given probation and some jail time. At the age of 22, he received 6 years in prison for armed robbery. He accumulated many disciplinary violations along with another criminal conviction for escape at age 26.

His first federal conviction was in 1997 on three counts of armed robbery of banks committed within less than two weeks. The sentence was 140 months on each robbery and ran concurrently. In prison his disciplinary record was lengthy and he assaulted a correctional officer for which he received a 46 month consecutive sentence. Eventually he was placed on

---

[1] In its brief here, the Government did not argue that Blair cannot raise his claims because he never brought a failure to rule to the attention of the court. In *United States v. Cunningham*, 429 F.3d 673, 679-80 (7th Cir. 2005) it was held that a lawyer in federal court is not required to except to rulings by the trial judge although the court observed that taking exception to the judge's failure to consider certain issues "might indeed have been a desirable thing for the lawyer to do—we might have been spared this appeal if [defense counsel] had done so. After announcing sentence Judge Randa said "Mr. Blair, any question as to what the Court did here today?" Blair replied "No." His lawyer, who argued this appeal, said nothing. Nor did his lawyer address the question of appealable issues when he was specifically asked if he would file a notice of appeal if Blair wanted to appeal. There was an opportunity to suggest that the record did not show a definitive ruling on some of the objections. The Government offers, instead, a contention that the defense abandoned, at least in part, its objections by not raising them orally but there is no requirement that written objections are forfeited if not raised orally as well.

supervised release and he was still on supervised release when he committed the offense in this case.

Blair's criminal record alone appears to leave no promising grounds for defense counsel to mitigate the penalty, but Blair had been troubled in other ways for a long time, and these were indeed potential mitigating factors. A presentencing psychological examination concluded he was paranoid schizophrenic and mentally retarded as well (IQ 65). His home life was bad enough for social services to remove him and place him in foster care and temporary shelters by the time he was 12. He ran away from every placement. Winding up in a treatment center for a month, he was discharged to his home. In the treatment facility he was uncooperative, physically aggressive to other residents, and verbally abusive to staff.

His relationship with family was not as bad as his criminal record would suggest. He continued to have contact with his mother toward whom he had no bad feelings. His mother died in 2007. In 1984 his mother told juvenile authorities that her son was attracted to bad youths, was easily persuaded and excited by danger. She indicated that her son was always scary, but it was not until the previous two years that he became mean and belligerent with her.

His step-sister said he was a sweet and quiet person who always had problems because of mental health issues. She was close to him in age and maintained contact with him throughout his life. She also believes he is not a violent person and has never tried to harm others. He has never appeared to her to be normal and had serious mental health issues which went untreated for years. Without a structure of supervision Blair will not maintain his medications. He needs continuing therapy and close monitoring.

Blair has been married to his second wife since 1996, before he went to prison. The marriage has survived his extensive periods of incarceration. His wife suffers from a compensable disability and does not work outside the home. Blair was living with her at the time he committed the robbery in this case.

Blair's defender argues that his life in prison has handicapped his ability, specifically his mental ability, to lead a law abiding life.[2] Blair says that, when he was 12, he began hearing voices warning him to watch out for people. In 1982, when Blair was 14, a psychologist at a juvenile treatment facility opined that Blair had a conduct disorder, under-socialized aggressive type. The psychologist noted lack of success in outpatient treatment. His IQ tested to 88.

In prison at Racine he was given Prozac which was discontinued in 1995. He was diagnosed with major depression without psychotic features and was responding well to medication. In 2000, Blair was seen by a chief psychologist at a federal prison after an incident in which he

---

[2] In 1993 while incarcerated in a state prison in Racine, Wisconsin he was diagnosed with enlargement of his breasts. This bilateral gynecomastia was, in the opinion of the University of Wisconsin Hospital physician, a long standing condition of about six years and of unknown origin. The condition had worsened over the last six months while Blair was taking Amitriptyline. Surgical correction was recommended and, at some later time, was performed. There is no claim that this physical ailment is a valid reason for mitigating sentence. It is offered to explain one possible cause aggravating his paranoia.

battered a correctional officer. The officer had ordered Blair back to his cell. Blair wanted a single cell due to his gynecomastia which embarrassed him. Later that same year he complained of paranoid feelings because of the way cellmates looked at him. By July 2001 Blair claimed further paranoid fears of being stabbed by an unknown person. He reported not getting along with his cellmate. By this time his gynecomastia had been surgically corrected and BOP concluded he just wanted a single cell. In August, he was evaluated as exhibiting delusional thinking—the diagnosis was adjustment disorder, anxiety disorder and mood disorder. After this he said he was seeing people making weapons and was fearful of being attacked. By late August, his custodians were thinking of paranoid schizophrenia and prescribed standard medications. In May 2002 he reported fear of his cellmate who was attempting to intimidate him.

In November 2004, a judge ordered an examination to determine competency to be sentenced for the attack on the correctional officer. Again Blair reported hearing voices and having fears of others; his diagnosis was antisocial personality disorder with no other disorders. He was found competent to be sentenced. In prison after sentence was imposed, Blair was found to have an IQ of 88.

The conviction for assault of a corrections officer led to about a six year incarceration at Florence, Colorado, a supermax institution. There he was diagnosed as a paranoid schizophrenic suffering from post-traumatic stress disorder. In 2011 he was released to an alternative sentencing program in South Dakota. While there, he applied for social security disability benefits. Psychologists concluded he was a paranoid schizophrenic, now with an IQ of 61 which is within the mentally retarded range. After South Dakota he was returned to Wisconsin for a treatment program where his evaluation was the same as that in South Dakota.

In Wisconsin, he lived in a half-way house and participated in a program to get medication morning and evening. He left the half-way house in later 2011 to live with his wife. He still appeared for his morning medication but not the evening dose. He robbed the North Shore Bank in West Allis in early December 2011. After he was taken into custody he scored a 65 on an IQ test.

B. The Sentencing Process

The applicable Guideline range is a term of incarceration between 151 months and 188 months. If it were not for the career offender enhancement the range would be less than half as high. Defense counsel does not and cannot claim the enhancement is inapplicable. In his opening brief he states "[t]here is no argument that the career offender guidelines did not technically apply because it was clear that the 1990 armed robbery, 1997 bank robbery, and 2004 assault did count as predicate offenses."

The Guidelines are advisory, not binding. Judges may depart from them for good reasons. Prosecutors and defense counsel are free to argue that a judge should not follow the Guidelines in an appropriate case. Mandatory minimums are binding, Guidelines are not.

The defendant offered two arguments why the career offender guideline ought to be mitigated at sentencing.

1.   The prior convictions are not entitled to the weight given them in the guideline.

On this point, Defense counsel first noted that the earliest prior conviction, the 1990 conviction, was close to being outside the time limit for counting toward the career offender designation. Defense counsel then noted that the second conviction, the 2004 conviction, did not include the indicia of violence that is usually associated with the career offender designation.[3] Defense counsel does not mention that in 1997 Blair was convicted of three separate violent felonies. Like the current offense, each of these was a bank robbery. Even if one disregards the 1990 and 2004 convictions, there are still three prior convictions that count, and only two are needed under the Guidelines.

Defense counsel also asserts that these prior convictions should essentially be severed from Blair's criminal history. All of the prior crimes were committed when Blair was "an individual of moderate intelligence." The Blair who committed the crime resulting in the conviction currently before the Court, however, had lost at least 20 points of IQ. Defense counsel asserts he is thus "no longer the same person who committed the crimes that drove his criminal history and consequently his career-offender designation."

2.   The offense for which he will be sentenced is less aggravated when considered in light of Blair's mental capacity.

Blair has been diagnosed with mental illness since he was 12 and, at every institutional stop along his life's way, some level of mental illness has been detected. This, his defender says, was a diminished capacity then and it is worse now in light of the large reduction of his IQ. He seemed to have no plan, dressed conspicuously and left the bank with no plan to get away. His declaration of purpose, to rob a bank for money he can use to pay restitution to earlier bank he robbed is a strong sign that he is operating with a diminished mental capacity.

C.  The Sentencing Hearing

In the sentencing hearing, the District Judge explicitly rejected a defense argument that a lighter sentence was appropriate because the prisons could not meet his medical needs. The alternative was to require Blair to remain subject to treatment and control outside of prison. The judge was unwilling to subject the public to the cost of seeing that Blair continued his medication and the risk that he would not. The judge found that Blair's condition as a paranoid schizophrenic may explain Blair's crimes but not excuse them.

In this appeal, Blair does not challenge either of these judicial conclusions. Blair attacks what he believes is the judge's failure to address the claims that leniency is appropriate based on Blair's diagnosis of mental retardation[4] and the related claim that the loss of 20 or so points

---

[3] Defense counsel offered no support for his argument about the 2004 conviction. The offense was violent. *See* United States Sentencing Guidelines Manual § 4B1.2. Blair struck a Bureau of Prisons counselor in the face with his fist. There are no statistics to establish that career offender designation is "usually associated" with career offenders. Guideline § 4B1.1 provides that both crimes of violence and controlled substance offenses will count in determining career offender status.

[4] Mental retardation can serve as a basis for finding that the career offender guidelines levels overstated the need to punish or that diminished capacity due to retardation justifies a below guideline sentence.

of IQ (qualifying Blair for mildly mentally retarded status) means that the Blair of today is not the same person as the Blair before his federal incarceration. For purposes of this opinion we assume that a radical change in personality before this recent bankruptcy could also support a decision giving lesser or no weight to the force of the career criminal guidelines.

Precedent does not require a formal ruling on defense or prosecution contentions at sentencing. Both parties are entitled to hear a judge "adequately explain the chosen sentence to allow for meaningful appellate review." *Gall v. United States*, 552 U.S. 38, 50 (2007) A District Judge is not required to "tick off every possible sentencing factor or detail and discuss separately, every nuance of every argument raised for this court to find that the sentence was proper." *United States v. Collins*, 640 F.3d 265, 271 (7th Cir. 2011).

> The district court must say enough to satisfy the appellate court that it has considered the parties' arguments and has a reasoned basis for exercising its own legal decision making authority. Furthermore, the court must address the defendant's principal arguments that are not so weak as to not merit discussion, though, a short explanation will suffice where the context and record make clear the reasoning underlying the district court's conclusion.

*United States v. Marin-Castano*, 688 F.3d 899, 902 (7th Cir. 2012) (internal citations omitted).

A failure to "say enough" in explaining a sentence is a procedural error and the standard of review is *de novo*. *United States v. Curby*, 595 F.3d 794, 796 (7th Cir. 2010).

At the hearing, the district judge announced he had read the presentence report and the various reports concerning Blair's psychological condition and his conduct after release from custody, particularly in relation to medical and other professional support. Neither party had objections to the factual statements in the presentence report. The judge announced he would determine the applicable guideline range first, and then consider the §3553 factors in determining sentence. The attorneys would make their arguments and, in the case of the defense, elicit a statement from an employee of Recovery Network, a service provider, that "work[s] with people with mental issues" and deals with state and federal probation and parole agencies. The allocution of the defendant would be the last step before sentence was passed.[5]

The Government asked for a sentence in the low end of the proposed Guideline of 151-188 months. At the sentencing hearing, the prosecutor asserted:

> [T]he key factor is not the Defendant's mental health or his…mild mental retardation but the fact the he robbed this bank while on supervised release following the robbery of …other banks. And the purposes of sentencing that are important here are…just punishment, respect for law, and a measure of deterrence, as well as protecting the public. The defendant and defense counsel argue really the purpose of sentencing here should be to provide the defendant with correctional treatment and mental health care.

---

[5] The judge heard statements from the bank employees impacted by the robbery. Defense counsel did not dispute the employees' claims of trauma; he said "I could echo some of their concerns. If that was my wife, if that was my sister I would feel exactly the same way."

And to a degree that's right. And the sentence policies do account for that. But I think in this case only to the degree that provides for protection of the public, which has to be paramount. And the reason it does is because of the Defendant's prior history.

The defense suggested a sentence of 18 months, but the prosecutor argued that a sentence of "even 10 years cannot provide the level of deterrence that is necessary here." The prosecutor further argued that Blair's mental health needs would "unfortunately" be best addressed in the prison system. As the prosecutor noted, "[h]e has demonstrated that when he is free in society, he has not taken his medication…and has not maintained his mental health, making him a risk to himself, but also a risk to others in society."

Defense counsel emphasized the "extreme stress" Blair was going through and his paranoid schizophrenia and his steep decline in IQ while at the Super Max. He argued that Blair was not "a normal bank robber," most of whom are feeding a drug habit or looking to pay rent or "going to go off and blow it on strippers." These bank robbers are "the most callous" individuals that can be. Gary's not that."

Defense counsel further asserted:

This was a cry for help. The form that it took is regrettable, and it has to be punished. But the form that it took does not call for a punishment of 15 years. It doesn't call for a punishment of a career offender.

His mental health care needs cannot be met in prison. In prison his I.Q. drops 27 points. That's not adequate health care.

He's regretful… it is deterred. This is hopefully---there's no guarantee that he'll never repeat this conduct, but there is a guarantee that with what we know now, the chances are much less likely.

Allocution was short beginning with an apology for what he had done and particularly the scaring of the tellers.

I wish I had never left Recovery Network because it was a nice place for me…if I would have stayed there, then none of this would have happened. I was taking my meds. When I left I stopped taking my medication. If you let me go back there, I promise never to get in trouble again. And I promise never to get in trouble again. [I'm] taking all my medication at this time.

The district court began by declaring the Guideline to be 151-188 months and noting the defense position that career offender guideline should not be applied because neither the crime nor the perpetrator were typical for the circumstances. Nor was the crime characterized by malevolence.

But as Judge Randa noted, there's no argument that the effect on the victims is the same as occurs with "normal" bank robbers and robberies. In a bank robbery "it's just not a matter of the money being taken." Judge Randa noted that the offense was aggravated since it was perpetrated while Blair was on release for earlier bank robberies. He further noted that Blair did apologize, and the probation officer who prepared the pre-sentence report thought Blair's

attitude was good.  Later the judge declared (after 37 years on the bench) that he did not know what a normal bank robbery or a normal bank robber may be.

In speaking directly to Blair, the judge told him his case was difficult because of the consistent diagnoses of paranoid schizophrenia and the large number of medications he needs. "And this diagnosis, while it occurred later on in your life, is one which the Court is clear was something that existed or at least was created through the horrific life that you've led."  The district court recited: (a) the physical beating from his stepfather and neglect in the family; (b) the question of how does a person grow up like that with the answer that "you don't"; (c) the disorderly and violent actions in homes and academies for children; and (d) the repeated escapes, property damage and burglaries.  This led to acquiring the tag of "significant danger to society."

The judge continued speaking to Blair about the views of defense counsel and the Recovery Network manager, who were hoping to get him away from institutionalization.  He noted that Blair's sister asserted a belief that he had been "institutionalized."  "They say you don't know how to function and cannot tolerate any form of stress. Your lawyer has argued that you just want to be left alone with your cats."

The judge told Blair, in effect, that sending him to a place like Recovery Network, would create a public risk because he could walk away from such a facility and commit a crime.  There are no guarantees, his own lawyer said, that he would not violate the law.  And the bank robbery here was committed while he was in supervised release and free to commit a crime.

Finally the judge told Blair that he has no confidence that another bank robbery won't happen again if he complied with Blair's promise that "if you let me go back there, I promise never to get in trouble again."

Then the judge announced that he did not think the amount of time in the 151-188 guideline is "necessary in this case."  He then imposed a custodial sentence that is 31 months lower than the bottom of the Guideline.

## II.  ANALYSIS

There was no need for the district court to discuss and rule specifically upon the argument that the Blair now to be sentenced was not the same person, meaning the same bank robber, that had committed the robberies of years past.

Defense counsel argued, more than once, that Blair is not the same person he was.  He has, in fact, no basis for making the argument.  The claim is essentially an off the cuff diagnosis by an unqualified witness.  A trained psychologist or psychiatrist might well be able to say that the loss of 20-27 points of IQ makes one or makes Blair a different person than he was.

A letter saying this could be considered at sentencing where hearsay is admissible.  But defense counsel never asked for a comparative analysis of Blair, the person before the Super Max, and Blair, the person after.  All of the expert reports were addressed to Blair's condition at the time of the examination and nothing else.

We do not conclude that defense counsel was ineffective in failing to  secure expert support for his rhetoric about Blair being a different person.  Even if such an opinion could be secured it would have little force in this case because Blair at IQ 61-65 engaged in the same kind criminal behavior that he displayed as Blair at IQ 88.  In any event, the argument that Blair is not the same person is "so weak as to not merit discussion."  *See United States v. Marin-Castano*, 688 F.3d at 902.

What remains of the appeal is the claim that the district court did not consider mental retardation as a ground for giving a less than Guideline sentence.  Defense counsel appears to be appealing a point that the district court decided in Blair's favor.  The Court imposed a sentence approximately 20% lower than the minimum of the Guideline.

That Blair was mentally retarded was not in dispute in this case; the prosecutor analogized Blair to others in society with diminished mental capacity and mild mental retardation. The district judge commented on the fact that Blair did not "know how to function" and thought it significant that the reason for robbing the bank was Blair's restitution debt from the last bank robbery, a fact which validates the impression of some retardation.  At the hearing, Defense counsel did not mention the IQ numbers as indicia of mental retardation, but rather as proof of the inadequacy of prison mental health care.

In the context of this case, there is no explanation for the district court's significant variance from the low end of the proper Guideline except for the mental status of Blair – his mental retardation.  All the other factors suggest a higher sentence, namely, his violence from early adolescence, his many criminal acts, his poor record in prison, his repeated armed robberies beginning in 1990, and his general lack of self-control.

In the absence of some mental deficit, some retardation, the facts in the sentencing memorandum would not likely support any below-guideline sentence.  Indeed, one might have expected the sentence to be above the minimum.  After a relatively short period of time without the support of the Recovery Network, Blair turned to the same crimes he began to commit in 1990.  All that was left to defense counsel was to mitigate the conduct by emphasizing mental deficits as the cause of crime rather than greed and malevolence.  A fair reading of the record demonstrates that these grounds for mitigation were considered, with care, by the district judge.  Indeed, this argument succeeded in cutting two and a half years from the minimum of the appropriate Guideline sentencing range.

AFFIRMED.